ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
DENNIS MITCHELL
Assistant United States Attorney
California State Bar Number: 116039
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2484
     Facsimile: (213) 894-6436
     E-Mail: dennis.mitchell@usdoj.gov

Attorney for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) No. CR 10-1066-JFW |
|---|---|
| Plaintiff, | ) <u>TRIAL BRIEF</u> |
| v. | ) 42 U.S.C. |
|  | ) § 6928(d)(2)(A)(unlawful |
| HARRY HUMPHRIES, ET AL., | ) storage of hazardous waste) |
| Defendants. | ) Trial Date: April 5, 2011 |
|  | ) Time: 8:30 a.m. |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby submits its trial brief.

I

THE INDICTMENT

Defendant Harry Humphries ("defendant") is charged in a one-count indictment with violating 42 U.S.C. § 6928(d)(2)(A))(unlawful storage of hazardous waste).

II

STATEMENT OF FACTS

The government intends to prove at trial the following facts, among others:

From sometime in the mid-90's through December 6, 2005, defendant was an owner and operator of Global Specialties Group, Inc. ("GSGI"), a chemical toll manufacturer in Rancho Dominguez, California. GSGI's business involved blending particular chemicals in order to manufacture a chemical product for its customers. Prior to owning GSGI, defendant was an owner and operator of a similar chemical toll manufacturer, known as AMCAL, which was located in Hawthorne, California.

GSGI operated at the Rancho Dominguez site from the mid-90's[1] until late 2005, when it ceased its operations and was forced to leave its premises. AMCAL operated its business at the Hawthorne site from approximately 1986 until late 1991 or early 1992. In late 1991, AMCAL was forced to vacate the Hawthorne site.

Both AMCAL and GSGI's manufacturing process created not only a final product for its customer, but also chemical by-products. One of those by-products was a methanol by-product and the other was a toluene by-product. The methanol by-product resulted from the manufacture of a methyl linoleate for a customer known as Anchor

---

[1] The evidence will also show that from late 1991 or early 1992, a company known as Everyday Products began operations at the Rancho Dominguez site and conducted the same type of chemical toll manufacturing as AMCAL and GSGI. In fact, co-defendant John Spicer was employed at Everyday Products in the same capacity as his employment with AMCAL and GSGI.

2

Chemical and from the manufacture of a family of chemical products known as alkanolamides for a customer known as Henkel.

In addition to the methanol by-product, both AMCAL and GSGI created a toluene by-product as a result of its manufacture of a resin, known as AB 327, for its customer, Duracoat Products.

The evidence will also show that both AMCAL and GSGI accumulated and stored the methanol and toluene by-products at their respective sites instead of disposing of those materials, and that defendant was well aware of this fact. The evidence will also show that when AMCAL shut down its operations at the Hawthorne site, it moved some or all of its methanol by-product to the Rancho Dominguez site.

In addition, through evidence consisting of testimony, photographs, and sample test results, the government will show that the methanol and toluene by-products stored by GSGI were "hazardous wastes," and that no permit was ever issued which would have authorized GSGI to store the methanol and toluene wastes. In addition,

**A.  Los Angeles County Fire Department Investigation Of GSGI In Late 2005.**

The government anticipates that Los Angeles County Fire Department ("LACFD") Investigator Jim McCarron ("McCarron") will testify that in October 2005, an emergency response unit from the LACFD had responded to the GSGI site due to a discharge. The following day, McCarron went to the GSGI site where he met with co-defendant Spicer and did a walk-through of the site.

Co-defendant Spicer informed McCarron that GSGI's business was the same business as AMCAL,[2] and that GSGI had to vacate the site within two weeks. Co-defendant Spicer also informed McCarron that defendant and his wife, Catherine Humphries, were his bosses. While at the site, McCarron observed storage drums throughout the premises.

On November 3, 2005, McCarron issued a Notice of Violation and Order To Comply (which has been marked for identification as Government's Exhibit No. 28) to defendant. That notice required, among other things, that GSGI provide a hazardous waste determination for the contents of containers located outside in the flammable storage area, and that GSGI label all hazardous materials/waste containers, and to provide containers in good condition that were sealed during storage.

On December 2, 2005, McCarron returned the GSGI site where he met with defendant's son, Bill Humphries ("B. Humphries"). McCarron learned that Humphries had been asked by defendant and defendant's spouse to clean-up the GSGI site. On an eastern facing wall were materials that Humphries indicated were by-products and wastes that the company was not able to get rid of. According to B. Humphries, chemical surplus companies had come out and looked at the these by-products and wastes and had determined that they could not use them.

During this visit, McCarron observed approximately 55-gallon drums stacked three-high on the aforementioned east wall. Humphries

---

[2] When McCarron met co-defendant Spicer at the GSGI site, he recognized him from the time McCarron investigated AMCAL in early 1992. See infra at

acknowledged that these drums consisted of methanol/glycerin by-product and toluene by-product.

The evidence will also show that defendant arrived at the GSGI site on December 2, 2005 and that he spoke with McCarron. Defendant admitted to McCarron that the methanol waste was a by-product from glycerin that came from the manufacture of a product for GSGI's customer, Anchor Chemical. Defendant also admitted that the toluene drums were by-product from resin made for one of GSGI's customers. Defendant also acknowledged, however, that it had been two years since the company had last blended chemicals for that customer. Defendant also acknowledged that the toluene had a small amount of water in it, and that it should have been sent back to the customer because it was still good product.

On December 6, 2005, McCarron returned to the GSGI and completed taking photographs and samples of various wastes. McCarron took samples from a reactor tank and from eight drums from the east wall. Two of those drums were labeled as containing methanol/glycerin and the remaining six were labeled as containing toluene or toluene/water. McCarron turned over the samples to the County Sanitation Districts of Los Angeles County where they were tested for their constituent contents and flash points. The test results from each of the drum samples indicated a flash point of less than 60 degrees Celcius.

B. Testimony Of Other Witnesses

The government intends to call co-defendant Spicer to testify with respect to GSGI's and AMCAL's storage of methanol by-product and toluene by-product wastes and defendant's knowledge of those

facts. The government anticipates that co-defendant Spicer will testify that as the plant manager for both AMCAL and GSGI, he reported to defendant and to Catherine Humphries.

Co-defendant Spicer will testify that defendant was well aware of the manufacturing processes used by AMCAL and GSGI to make the methyl linoleate, the alkanolamides, and the AB 327 products, and the fact that these processes resulted in methanol by-product or toluene by-product being stored at the AMCAL and GSGI's sites. Co-defendant Spicer will also testify about his having discussed the need to dispose of these by-products with defendant. Co-defendant's Spicer's testimony and other evidence will also show that defendant was aware of the flammable nature of both the methanol and toluene by-products being stored at the GSGI site.

The government also anticipates that defendant's son, Bill Humphries ("B. Humphries") will testify about his efforts to clean up the GSGI site on behalf of defendant and Catherine Humphries in late 2005. In addition, the government expects that B. Humphries will inform the jury that there was toluene mixed with water that was stored at the site, and that there were drums of methanol by-product stored at the site.

The government also expects that EPA Special Agent Annette O'Donnelly, the former case agent in this matter, will testify about her interview with defendant on July 10, 2010. During that interview, defendant admitted that GSGI was a toll producer, that the landlord for the GSGI site had died, that the property had been left to the Ford Foundation, and that he and Catherine Humphries had brought in B. Humphries to help with the by-products which consisted

6

of toluene.[3] Defendant further stated that the toluene drums at the site were in poor condition because they had been stored outside where the rain fell on them, and that toluene had been at the site for two years.

The government will also call Ernest Reguly, an attorney who represented the estate that owned the GSGI property. Reguly will testify about the chemical waste that he observed at the GSGI site and his unsuccessful efforts to get defendant and GSGI to clean up the waste.

However, when Reguly visited the GSGI site, he observed a gelatinous mess about an inch thick covering the floor and barrels of assorted materials spread all over the property. Reguly further recalls that the landlord's estate was ultimately forced to pay for the clean-up, and that the waste that was ultimately removed included radioactive waste.

The government will also introduce testimony and documentary evidence to show that after April 2004, Duracoat had ceased ordering it resin product from GSGI, and, thereafter, GSGI stopped manufacturing the resin product for GSGI.

---

[3] During the interview, defendant claimed that the by-products, which consisted of toluene, were from Abe Lasher, who was the prior tenant of the GSGI site and had made an agreement with defendant to have his chemicals stored at the site. The government, however, anticipates that the evidence will show that the toluene by-product at the GSGI site belonged to GSGI.

**C.  Rule 404(b)/Prior Acts Evidence**

If allowed by the Court, the government will also introduce evidence from Los Angeles County Department Inspector Brenda Wright on the events leading to her issuance of a Notice of Violation and Order To Comply to GSGI in October 2004.  In addition, the government would introduce testimony from McCarron on his observations in early 1992 at the AMCAL site that led to his issuing a Notice of Violation and Order to Comply in March 1992.

### III
### LEGAL ISSUES

**A.   Elements of 42 U.S.C. § 6928(d)(2)(A)**

The government has the burden of proving the following elements:

1. That on or after September 30, 2005, the defendant knowingly stored a waste material;

2.  That the waste material that was stored was a hazardous waste;

3.  That the storage was done without a permit; and

4.  That the defendant knew the waste material had the substantial potential to be harmful to others or to the environment.

**1.  First Element - Knowingly Storing A Waste Material**

In order to satisfy this first element, the government must prove that defendant was aware that methanol by-product and/or the toluene by-product was being stored at GSGI, and that either or both of these materials was a waste material.

For purposes of 42 U.S.C. § 6928(d)(2)(A), a solid waste includes liquids and includes any "discarded material" that has not

8

been excluded by the federal regulations. 42 U.S.C. § 6903(27). The term "discarded material" is defined to include "any material that is abandoned, recycled, or inherently waste-like." 40 CFR § 261.2(a)(2).

The definition of an "abandoned" material" includes a material that is accumulated, stored, or treated before or in lieu of being disposed of, burned or incinerated." 40 CFR § 261.2(b). Because the toluene by-product and methanol by-product were accumulated and stored at GSGI in lieu of being disposed of, each of these by-products falls within the definition of a solid waste. Accordingly, if the evidence shows that defendant was aware of the accumulation and storage of these materials at GSGI during the period from September 30, 2005 through December 6, 2005, the evidence will satisfy the first element of a violation of 42 U.S.C. § 6928(d)(2)(A).

Defendant's counsel has indicated that defendant did not consider the toluene by-product to be a waste because GSGI would re-use it in the manufacture of a resin product for its customer, Duracoat. However, the government expects that the evidence will show that by the end of April 2004, Duracoat had stopped ordering the resin product from GSGI, and, thereafter, GSGI ceased re-using any of the stored toluene by-product.

It should also be noted that even if GSGI had re-used some of its toluene by-product in late 2005, such re-use of the by-product would not exempt the toluene by-product from being a waste under federal law. Federal regulations specifically provide that certain materials, such as by-products, are characterized as a hazardous waste if they are accumulated speculatively. Under 40 CFR

§ 261.1(c)(8), "[a] material is "accumulated speculatively" if it is accumulated before being recycled."

    2.   <u>The Second Element - That The Stored Waste Material Was A Hazardous Waste</u>.

Federal law defines a waste as being a hazardous waste if it is a listed hazardous waste or if the waste exhibits one or more characteristics identified in the regulations. 40 CFR 261.3(a)(2). Among those characteristics is a flash point of less than 60 degrees Celcius for a liquid (other than an aqueous solution that contains less than 24 percent alcohol). 40 CFR § 262.21(a)(1). In this case, the government will introduce evidence to show that both the toluene by-product and methanol by-product stored at GSGI in late 2005 had flash points below 60 degrees Celcius, and, therefore, fall within the definition of a hazardous waste.

    3.   <u>The Third Element - That The Storage Was Done Without A Permit</u>

The government intends to introduce testimony and documentation from Rick Jones, Senior hazardous Substances Scientist with the California Department of Toxic Substances Control, to show that no permit to storage hazardous waste was ever issued for the GSGI facility. It should also be noted that knowledge of a defendant that a permit is lacking is not an element of the offense under 42 U.S.C. § 6928(d)(2)(A). <u>United States v. Hoflin</u>, 880 F.2d 1033, 1036039 (9th Cir. 1989).

    4.   <u>The Fourth Element - That Defendant Knew The Waste Material Had The Substantial Potential To Be Harmful To Humans Or To The Environment</u>.

To satisfy this fourth element, the government must prove that defendant knew that the stored waste had the potential to be harmful to others or to the environment. <u>See</u> <u>United States v. Hoflin</u>, 880

```
 1  F.2d 1033, 1039 (9th Cir. 1989).  In this case, the government
 2  intends to introduce evidence pertaining to defendant's experience
 3  as a chemical manufacturer, defendant's background, including
 4  experience as an engineer at a large chemical corporation known as
 5  Henkel, notices of violation issued to defendant, co-defendant
 6  Spicer and/or to GSGI, and one or more discussions involving
 7  defendant which together show that defendant was well aware of the
 8  substantial potential that the toluene and methanol by-products
 9  could be harmful to others or to the environment.
```

DATED: 3-31-11

Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

*/s/ Dennis Mitchell*

DENNIS MITCHELL
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

11